**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-00994-CMA

CHAD ABERCROMBIE, et. al.,

      Plaintiffs,

v.

AETNA HEALTH, INC., et al.,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' JOINT MOTION TO DISMISS**

---

This lawsuit is brought by eighty Colorado chiropractors, who allege that a host of health insurance companies violated Colorado state law in paying them significantly less than other healthcare providers (e.g., Medical Doctors or Doctors of Osteopathy), for providing substantially identical medical services.  (Doc. # 39, ¶ 46-47.)  Defendants' Joint Motion to Dismiss (Doc. # 45) counters that no such violation occurred, because the statute upon which Plaintiffs base their claims of underpayment, Colo. Rev. Stat. § 10-16-102(7) (Section 10-16-102(7)), is intended to secure equal reimbursement for insurance **policyholders** – not for **health care providers**.  As explained in further detail below, the Court agrees with Defendants' interpretation of the statute.  Additionally, because Plaintiffs' remaining claims are premised on a violation of Section 10-16-102(7), it grants the instant Motion and dismisses this case.

## I.  <u>BACKGROUND</u>

The insurance companies ("Carriers")[1] involved in the instant lawsuit are in the business of selling health insurance policies to Colorado consumers and employers. (Doc. # 39, ¶¶ 2, 16.)  Plaintiffs, eighty chiropractors, fall into two overarching categories.  The first category, "In-Network Providers" (INPs), have express contracts (known as "Provider Agreements") with insurance companies, including Carriers.  These Provider Agreements contain payment schedules outlining reimbursement rates for particular health care services covered under the Carriers' health insurance plans; for example, providing that a chiropractor is paid $28.00 to perform a chiropractic adjustment for a patient covered by insurance policy/plan XYZ.  The second category, "Out-of-Network Providers" (ONPs), have no such Provider Agreements with a particular Carrier, and thus are paid at a rate determined by the Carrier.  (*Id.*, ¶¶ 10-11, 16-24.)

In their Complaint, both categories of Plaintiff-providers explicitly deny that they are bringing claims against the Carriers "on behalf of any [health insurance] policyholder" or "under a[n] insurance policy." (*Id.*, ¶ 39.)  Rather, Plaintiffs allege that, based on the Colorado Health Services Fee Schedule Act, C.R.S. § 10-16-101 *et seq.* (the Act), the Carriers had "an independent duty" to reimburse them for performing

---

[1] Defendants currently include the following Carriers: Aetna Health, Inc.; Anthem Blue Cross and Blue Shield; CIGNA HealthCare of Colorado; Humana Insurance Company; Humana Health Plan, Inc.; Humana MarketPOINT, Inc.; UnitedHealthCare of Colorado, Inc.; and Health Value Management Inc. (d/b/a ChoiceCare Network).

substantially identical services as other medical professionals – notwithstanding the reimbursement provisions provided in Provider Agreements, if applicable.  (*Id.*, ¶ 40.)

In addition to a claim for a violation of the Act, Plaintiffs' Amended Complaint also brings four other state-law claims against Defendants (which are, as explained in greater detail below, contingent upon the success of Plaintiffs' claims under the Act): (1) breach of contract; (2) violations of the Colorado Consumer Protection Act (CCPA); (3) violations of C.R.S. §§ 10-3-1115, 1116 (for improper denial of claims); and (4) unjust enrichment.  (Doc. # 39.)

## II.  LEGAL STANDARD

Rule 12(b)(6) permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  *See* Fed. R. Civ. P. 12(b)(6).  In deciding a motion brought under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Specifically, to withstand a motion to dismiss, a complaint must contain sufficient allegations of fact to state a claim for relief that is not merely conceivable, but is also "plausible on its face."  *Id.* at 570.  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. at 678 (citing *Twombly*,

550 U.S. at 556).  "Plausibility" refers to the "scope of the allegations in a complaint: if

they are so general that they encompass a wide swath of conduct, much of it innocent,

then the plaintiffs 'have not nudged their claims across the line from conceivable to

plausible.'  The allegations must be enough that, if assumed to be true, the plaintiff

plausibly (not just speculatively) has a claim for relief."  *Robbins v. Oklahoma*, 519 F.3d

1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

## III.  ANALYSIS

The outcome of the instant Motion turns on an issue of first impression under

Colorado state law: to wit, whether the Act requires Carriers to pay medical

professionals like Plaintiffs the same amount as other health care professionals for

providing substantially the same kinds of medical services.  As a preliminary matter, the

Court notes that this case is brought under diversity jurisdiction and requires an

interpretation of state law; as such, this federal Court's task is to "ascertain and apply"

that state law.[2]  *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007)

(internal quotation marks omitted).  Specifically, "the federal court must look to the

rulings of the highest state court, and, if no such rulings exist, must endeavor to predict

how that high court would rule."  *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir.

2002).  Neither the Colorado Supreme Court nor the Colorado Court of Appeals has

addressed the question of statutory interpretation currently facing the Court;

---

[2] Defendants removed this action, asserting that the Court had two independent bases of subject matter jurisdiction: (1) diversity jurisdiction (pursuant to 28 U.S.C. § 1332(a)), and (2) original federal jurisdiction (pursuant to 28 U.S.C. § 1331, as Plaintiffs bring claims that arise under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*)  (Doc. # 1, ¶¶ 11-12.)  The parties agree that Colorado law governs the interpretation of the Act.

accordingly, the Court applies Colorado state law regarding statutory construction in "endeavoring to predict" how the Colorado Supreme Court would rule on this question.[3]

The Colorado Supreme Court has instructed that, when conducting statutory interpretation, a court must ascertain and give effect to the intent of the legislature – what it sensibly considers the "polestar" of statutory instruction. *People v. Kailey,* 2014 CO 50, ¶ 13; *see also Conrad v. City of Thornton*, 553 P.2d 822, 826 (Colo. 1976) (noting that legislative intent provides "[t]he guiding light in construing statutes.")  To effectuate this intent, a court looks first to the plain language of the statute, giving words and phrases their plain and ordinary meaning, examining language in the context of the statute as a whole, rejecting interpretations that render words or phrases superfluous, and striving to give "consistent, harmonious, and sensible effect to all [of the statute's] parts." *See Reno v. Marks*, 2015 CO 33, ¶ 20 (internal citations omitted); *see also* C.R.S. § 2–4–101 ("Words and phrases shall be read in context and construed according to . . . common usage"); *Foiles v. Whittman*, 233 P.3d 697, 699 (Colo. 2010) ("All related provisions of an act must be construed as a whole"); *People v. Cross*, 127 P.3d 71, 73 (Colo. 2006) ("Often the best guide to legislative intent is the context in which the statutory provisions appear.").  Additionally, a court should avoid interpretations that would lead to an absurd result or otherwise defeat statutory intent. *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1088–89 (Colo. 2011); *see also Lagae v. Lackner*, 996 P.2d 1281, 1284 (Colo. 2000) ("Although we must give effect to the

---

[3] It bears mention that neither party has asked the Court to certify any question of law to the Colorado Supreme Court, despite the fact that both parties repeatedly acknowledge in their briefing on the instant Motion that there is no case law on point.  The Court is not inclined to do so *sua sponte.*

statute's plain and ordinary meaning, the General Assembly's intent and purpose must prevail over a literalist interpretation that leads to an absurd result.")

If the statutory language is clear and unambiguous, the court need go no further; it simply applies the words as they are written. *Nieto*, 993 P.2d at 501. However, where the words chosen by the legislature are reasonably capable of two or more constructions leading to different results, the statute is considered ambiguous. *Id.*; *see also Jefferson Cnty. Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935-36 (Colo. 2010) (quoting 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 45:2, at 13, 19 (7th ed. 2007) ("A statute is ambiguous when it 'is capable of being understood by reasonably well-informed persons in two or more different senses.'")) When a statute is ambiguous, in determining the intent of the general assembly, a court "may consider, among other matters" the following:

> (a) The object sought to be attained; (b) The circumstances under which the statute was enacted; (c) The legislative history, if any; (d) The common law or former statutory provisions, including laws upon the same or similar subjects; (e) The consequences of a particular construction; (f) The administrative construction of the statute; (g) The legislative declaration or purpose.

C.R.S. § 2–4–203(1); *see also Rowe v. People*, 856 P.2d 486, 489 (Colo. 1993) ("If a statute is ambiguous, we may determine the intent of the General Assembly by considering the statute's legislative history, the state of the law prior to the legislative enactment, the problem addressed by the legislation, and the statutory remedy created to cure the problem.").

**A.**     **Plaintiffs' Claims Under Section 10-16-104(7)**

The overarching statute at issue in this case is entitled the "Colorado Health

Services Fee Schedule Act."  Colo. Rev. Stat. § 10-16-101.  Plaintiffs' claims are

premised on a violation of a section of that Act entitled "Mandatory Coverage Provisions

– Definitions."  Colo. Rev. Stat. § 10-16-104 (Section 10-16-104).[4]  Specifically, Section

10-16-104(7) provides that:

> **Reimbursement of providers**. (a) **Sickness and accident insurance**.
>
> (I)(A)   Notwithstanding any provisions of **any policy of sickness and accident insurance** issued by an entity subject to the provisions of part 2 of this article or a prepaid dental care plan subject to the provisions of part 5 of this article, **whenever any such policy or plan provides for reimbursement for a service that may be lawfully performed by a person licensed in this state for the practice of** osteopathy, medicine, dentistry, dental hygiene, optometry, psychology**, chiropractic**, podiatry, or acupuncture, **a carrier shall not deny reimbursement under the policy or plan** when the service is rendered by a person so licensed.
>
> Nothing in this part 1 or part 2 or 5 of this article precludes a carrier from setting **different fee schedules in an insurance policy** for different services performed by different professions, but the carrier shall use the same fee schedule for those portions of health services that are substantially identical although performed by different professions.
>
> (II)     The provisions of subparagraph (I) of this paragraph (a) shall apply:
>
> (A)      To all individual sickness and accident policies issued on and after July 1, 1973;
>
> (B)      To all blanket and group sickness and accident policies issued, renewed, or reinstated on and after July 1, 1973.

---

[4] In their Complaint, and throughout their Response to the instant Motion, Plaintiffs refer to Colo. Rev. Stat. § 10-16-104 as the "Equal Pay Statute," apparently a name of their own choosing. (*See* Doc. # 56 at 1) ("In Colorado, reimbursement of providers, including chiropractors, is specifically addressed in Subsection 7 of C.R.S. § 10-16-104 (hereafter referred to as the 'Equal Pay Statute') . . . ."); (Doc. # 39 at 2) ("The claims asserted by the Providers herein all arise from the Carriers' systematic violation of C.R.S. § 10-16-104(7) (the 'Equal Pay Statute.')").

(2012; repealed effective Jan. 1, 2014) (emphasis added).  For ease of reference, the Court will refer to the first sentence of Section 10-16-104(7) as the "Anti-Discrimination Provision" (as it provides that insurance companies may not discriminate, i.e., "deny reimbursement" under a "policy or plan," if a patient obtains treatment from, for example, a chiropractor rather than an M.D.).  Additionally, the Court will refer to the second sentence of Section 10-16-104(7), about how carriers must use "the same fee schedule for those portions of health care services that are substantially identical although performed by different professions," as the "Fee Schedule Equality Provision."

The Carriers argue that the duties outlined in Section 10-16-104(7) are confined to the reimbursements owed by Carriers to insured consumers under those individual consumers' insurance policies.  Consequently, they contend, the statute simply does not address any reimbursement owed to health care providers, including Plaintiffs.  Specifically, the Carriers note that a "policy of sickness and accident insurance" is explicitly referenced and is defined elsewhere in the Act as "any policy or contract of insurance against loss or expense resulting from the sickness of **the insured,** the bodily injury or death **of the insured** by accident, or both."  Colo. Rev. Stat. § 10-16-102(50) (emphasis added).  In other words, a "policy of sickness and accident insurance" is, by definition, a "policy or contract" between an insured policyholder/ consumer and the Carrier – **not** between a health care provider (like Plaintiffs) and the Carrier.[5]  Thus, the

---

[5] In contrast, a "health care contract" is defined as "a contract entered into by . . . a person or entity **and a health care provider** for the delivery of health care services **to others**," and a "health care provider" is defined as "a person licensed or certified in this state to practice medicine, pharmacy, chiropractic, nursing, physical therapy, podiatry, dentistry, optometry,

Carriers contend, when the Fee Schedule Equality Provision mandates that health insurance companies may set "different fee schedules **in an insurance policy**," but must use the "same fee schedule for those portions of health services that are substantially identical although performed by different professions," it is referencing the same "policy of sickness and accident insurance" (i.e., a policy for an "insured" consumer) as that referenced in the earlier Anti-Discrimination Provision. Concomitantly, Section 10-16-104(7) is not referring to monies owed to health care providers under, for example, a Provider Agreement (or, when such Provider Agreements do not exist, under an implied contract).  Moreover, the Carriers note that Section 10-16-104(7)(II) explicitly indicates that Section 10-16-104(7) applies to individual health insurance policies, in noting that the Section applies "[t]o all **individual sickness and accident policies** issued on and after July 1, 1973" and "all **blanket and group sickness and accident policies** issued, renewed, or reinstated on and after July 1, 1973."  Colo. Rev. Stat. § 10-16-104(7)(II) (emphasis added).

Plaintiffs do not specifically rebut Defendants' plain language arguments in their Response, and their **sole argument**[6] regarding the plain language of the statute begins

---

occupational therapy, or other healing arts," or "an ambulatory surgical center, a licensed pharmacy or provider of pharmacy services, and a professional corporation or other corporate entity consisting of licensed health care providers as permitted by the laws of this state."  *See* Colo. Rev. Stat. § 25-37-102(6) (emphasis added).  The Carriers argue – and the Court agrees – that had Colorado General Assembly intended that Section 10-16-104(7) ensure that **health care providers** were paid the same amounts by carriers, it likely would have done so explicitly by using the term "health care contract," rather than the term "policy of sickness and accident insurance," as it does, for example, in Colo. Rev. Stat. § 25-37-103, which governs required and permissible provisions in "health care contracts."

[6] Plaintiffs' remaining plain-language arguments are at once conclusory and circular. Specifically, Plaintiffs quote selected portions of the Act and simply assume their preferred

and ends with the title of the subsection at issue.  In Plaintiffs' view, the fact that "[t]he

statute is plainly entitled 'Reimbursement of Providers,' . . . **undeniably indicates that**

**the [Act] is directed to the reimbursement of providers by carriers**."  (Doc. # 56 at

7) (emphasis added); *see also id.* at 7–8 ("If the legislature did not intend [Section 10-

16-104(7)] to apply to providers, it would not have entitled that section 'Reimbursement

of Providers.'")  Plaintiffs' interpretation, however, would place far more weight on the

sub-section's title than it may reasonably bear.  Under Colorado law, although statutory

titles and legislatively enacted section headings may be **considered** in construing a

statute's meaning, they are not dispositive of – and therefore may not be "undeniably

indicative" of – such meaning.  *See Martinez v. Cont'l Enters.*, 730 P.2d 308, 313 (Colo.

1986) ("Although the title of a statute is not dispositive of legislative intent, it may be

used as an aid in construing a statute"); *Jefferson Cnty. Bd. of Equalization v.*

*Gerganoff*, 241 P.3d 932, 936 (Colo. 2010) (same, with respect to "a legislatively

selected heading" of a statute).

Regardless, the sub-section title implicated here actually provides no support

whatsoever for Plaintiffs' proposed interpretation of Section 10-16-104(7), because

---

construction of the statutory language.  For instance, Plaintiffs assert, without explanation or
support, that "the language of the second sentence [of section 10-156-104(7)] **is also clearly
meant to apply to reimbursement of providers by carriers** and requires carriers to 'use the
same fee schedule for those portions of health services that are substantially identical although
performed by different professions.'"  (Doc. # 56 at 7) (emphasis added).  Similarly, in response
to the Carriers' argument that, in light of the Act's multiple references to policies of "sickness
and accident insurance," the Act governs reimbursement rates between patients and Carriers,
Plaintiffs merely assert that "**Defendants' argument is inconsistent with the language of the
[Act] which is clearly directed at the relationship between the insurer and health care
provider.**  Simply put, the [Act] governs how an insurer must reimburse healthcare providers for
services covered under a health insurance policy."  (*Id.* at 7) (emphasis added).

when the Fee Schedule Equality Provision was added in 1973, the statutory section was not entitled "Reimbursement of providers", but "Form and content **of policy**."[7]  *See* Act of July 1, 1973, ch. 238, 1973 Colo. Sess. Laws 851 (emphasis added).  Significantly, the title of Section 10-16-104(7) did not change from "Form and content of policy" to "Reimbursement of Providers" until 1992, when the statute was reorganized – that is, a full nineteen years **after** the Fee Schedule Equality Provision was added – a change the public law characterized as a "nonsubstantive revision."  *See* Act of July 1, 1992, ch. 207, 1992 Colo. Sess. Laws 1617, 1629.  If anything, then, the title of Section 10-16-104(7) actually provides further support for the proposition that the statute was designed to ensure that individual **policy**holders, not health care providers, are reimbursed equally regardless of the medical provider they chose.  Not only did the title of the statute from 1973 to 1992 explicitly refer to such policies, but the change to the title to "Reimbursement of providers" in 1992 was also considered to be "nonsubstantive" in any case.[8]

Additionally, Plaintiffs' interpretation cannot account for the structure of Section 10-16-104; in contrast, the Carriers' interpretation of the Act is perfectly congruent with this statutory structure.  Specifically, Plaintiffs fail to explain why it would be sensible for

---

[7] "Form and content of policy" was also the statutory title when Section 10-16-104 was first enacted in 1951, as Colo. Rev. Stat. § 10-8-103 (1951).  *See* Act of Jan. 1, 1952, ch. 206, 1951 Colo. Sess. Laws 492.

[8] The Court finds it disturbing that, given the considerable weight Plaintiffs attached to the title of Section 10-16-104(7), they either (a) did not do the necessary research to determine that the statutory section was not, in fact, entitled "Reimbursement of Providers" in 1973 (despite contending elsewhere in their Response that "the relevant issue here is the intent of the statute at the time it was enacted in 1973"), or (b) simply did not acknowledge this contrary authority in their Response.  (*See* Doc. # 56 at 7–8, 12.)

the Colorado legislature to place a **singular provision** aimed at benefitting health care providers in Section 10-16-104, when the rest of the provisions in that Section are aimed at benefitting individual policyholders.  Section 10-16-104 is entitled "Mandatory Coverage Provisions – Definitions," and, consistent with this title, the statutory sections that fall within Section 10-16-104 regulate the types of coverage that must be provided in health insurance policies to individual policyholders.  For example, Section 10-16-104(1) regulates the coverage that must be provided to the newborn children of a policyholder, and provides that "All group and individual sickness and accident insurance policies . . . shall provide coverage for a dependent newborn child of the insured or subscriber from the moment of birth."  Other subsections of Section 10-16-104 regulate what treatment coverage health insurance plans must provide, for example, with respect to mental illness (section 10-16-104(5)), hospice (section 10-16-104(8)), alcoholism (section 10-16-104(9)), and preventative care (section 10-16-104(18)).  Indeed, it would have been far more sensible for the legislature to have placed a provision governing reimbursement for health care providers elsewhere in the statute book.  For example, Colo. Rev. Stat. § 25-37-103 governs "Health care contracts—required provisions—permissible provision[s]," and specifically regulates, among other things, the allowable fee schedules in "health care contracts."  Accordingly, in addition to being consistent with the plain language Section 10-16-104(7), the Carriers' interpretation is also consistent with the Act's structure, by which every subsection of Section 101-16-104 enumerates the types of medical coverage that must be offered to individual policyholders in their insurance plans.

In sum, after examining the plain language of Section 10-16-104(7), including examining that language in the context of the statute as a whole and striving to give "consistent, harmonious, and sensible effect to all [of the statute's] parts," *see Reno*, 2015 CO at ¶ 21; *Foiles*, 233 P.3d at 699; *Cross*, 127 P.3d at 73; the Court finds that Defendants' interpretation of Section 10-16-104(7) prevails.  Accordingly, the Court determines that the Colorado legislature intended that the reimbursement provisions of Section 10-16-104(7) apply to individual policyholders, that is, individual consumers – **not** to health care providers.

Although the Court also agrees with the Carriers that the statutory language is not ambiguous, its interpretation of Section 10-16-104(7) is also significantly bolstered by the Act's legislative history.  In 1973, Colorado's Insurance Commissioner[9] provided the following explanation about the need for the Act, in testimony before the Senate State Affairs Committee:

> [O]ver the last four years, you have amended this portion of 72-10[10] to add additional professions as optional. . . .  It used to be that if I had a policy which provided, for example, for refraction of the eyes, that the policy stated it had to be done by an M.D., so I had to go to an ophthalmologist. If I wanted to go to an optometrist for refractions, **I didn't get any reimbursement from my policy** because the policy said an M.D. **So the optometrist came in and got the amendment put in the bill so that I would have my choice as insured.**  The podiatrist has similar problems. . . . If I had a foot problem, which is covered by the policy, which either a podiatrist is licensed to do or an M.D. is licensed to do, previously,

---

[9] The Carriers' Motion quotes this individual and indicates that he was the Colorado Insurance Commissioner, but does not provide his name; he is described as an "unidentified male" in the transcript of the Senate Hearing that was attached as an exhibit in support of the Motion. (*See* Doc. ## 45 at 16; # 45-3 at 4.)  However, Plaintiffs did not object to his identification as such in their Response brief.

[10] The statute was originally numbered Colo. Rev. Stat. § 72-10-3.  *See* Act of July 1, 1973, ch. 238, 1973 Colo. Sess. Laws 851.

if I went to a podiatrist, I got no reimbursement out of my pocket even though I had insurance.  If I went to an M.D., I did get reimbursed. . . . **So the law was amended to permit the option of the insured as to which profession he went to**, provided the policy covered that particular care.  **Now the next thing that happened was that some of the insurance companies started putting two fee schedules in their policies** which said, <u>if you go to an ophthalmologist</u> for an eye refraction, assuming the policy covers that, <u>we'll pay you $20</u>.  <u>If you go to an optometrist, we'll only pay you $10</u>. . . . **So the people who are behind this bill are the ones who would like to see the insured<u>, the insuring public have his choice of the practitioner</u> that he goes to for coverages under his policy <u>but yet be able to collect the same amount regardless of which he goes to.</u>**

Hearing on S.B. 1107-1973 Before the S. State Affairs Comm., 49th Gen. Assemb.

Assemb., 1st Reg. Sess. at 4-6 (Colo. 1973) (emphasis added) (transcript attached as

Doc. # 45-3).  In other words, the Colorado Insurance Commissioner indicates that the

legislature's initial efforts to protect consumer choice with the Anti-Discrimination

Provision – in ensuring insurance companies were not permitted to deny coverage

outright for medical visits by licensed providers, such as ophthalmologists or podiatrists

– resulted in insurance companies attempting to continue to affect their policyholders'

choices of health care providers in a more indirect fashion.  Specifically, the companies

restructured health insurance policies so as to provide different amounts of

reimbursement to consumers, such that particular providers were still being

"discriminated" against because they were relatively more expensive than other

providers.  Accordingly, the next logical step in guaranteeing that the "insuring public" is

able "to collect the same amount [of money], regardless of which [provider] he goes to"

was to mandate equality of reimbursement in the fee schedules **of consumer's**

**insurance policies**.

Similarly, Dr. Jack May, who identified himself as a member of the Colorado

Optometric Association, testified as follows:

> In all cases, except one that I'm aware of, in this state today **no plan of vision care benefits pays 100 percent of what the bill usually is**. They'll pay a certain amount and then **the patient must be prepared to pay the balance**.  And what we're concerned that could happen as has happened with some other plans is that **a substantially higher premium would be paid to, for example, ophthalmology rather than optometry** and **then because of economic reasons, the patient who used to be patients of optometry would then go to ophthalmology.**

*Id.* at 13.  Echoing the testimony of the Colorado Insurance Commissioner, Dr. May

indicates that the legislature was concerned with equality in reimbursement for **patients**

**themselves**.  He noted that patients would be motivated by the economic

consequences of the policies' differing reimbursement rates because they were paying

money out of their own pocketbooks to see differing providers and were thus likely, for

economic reasons, to see the cheapest provider for similar services, notwithstanding

the Non-Discrimination Provision.

Plaintiffs do not specifically rebut or explain how the above statements are

consistent with their interpretation of the Act, other than to assert that the legislative

history cited by Defendants "**merely addresses a collateral issue,** which is that

reimbursing covered providers the same amount for substantially identical services

would also benefit policyholders by providing them with more choices of providers for

the same services."  (Doc. # 56 at 10) (emphasis added).  The Court disagrees with this

conclusory characterization of the testimony.  Both the Insurance Commissioner and Dr.

May specifically addressed how Section 10-16-104(7) was designed to stop insurance

companies from circumventing the statute's Anti-Discrimination Provision by

manipulating fee schedules such that no economically rational consumer would choose to go to, for example, an optometrist over an ophthalmologist.  If anything, then, this legislative history indicates that if any party was to "collaterally benefit" from Section 10-16-104(7), such a benefit would flow not to consumers, but to the types of health care providers that were enumerated by the legislature in the Anti-Discrimination Provision – i.e., the chiropractors, osteopaths, dental hygienists, optometrists, psychologists, podiatrists, and acupuncturists who would see relatively fewer patients without an equal fee schedule.[11]

Plaintiffs assert that another portion of the legislative history supports their interpretation – specifically, the hearings that occurred on House Bill 1107, the House equivalent of Senate Bill 1107:

> [D]uring the legislative hearings on House Bill 1107, there was a . . . discussion regarding whether an optometrist and an ophthalmologist should be reimbursed the same amount for performing an eye exam. During the hearing, Representative Bendelow stated:
>
> > I'm reacting as a lawyer, okay?  And I'm saying, like, when I go to a real estate closing, for example, 90% of our real estate closings can be handled just as easily by a real estate person as by myself, but as to the 10%, you know, I find out there's a defect in the deed or,

---

[11] In a footnote to their Response to Defendants' Motion, Plaintiffs assert that, "[a]t the very least, Plaintiffs are third party beneficiaries with a private right of action **under the Equal Pay Statute** [sic]."  (Doc. # 56 at 15 n. 8) (emphasis added).  However, Plaintiffs' sole support for this proposition, *Salzer v. SSM Healthcare of Oklahoma, Inc.*, 762 F.3d 1130, 1136 (10th Cir. 2014), is a case regarding the potential viability of an insured's third-party beneficiary status under **an agreement between a healthcare provider and an insurer**, and thus offers no support for the proposition that Plaintiffs can be "third party beneficiaries" **under Section 10-16-104(7)**.  Additionally, Plaintiffs' Amended Complaint contains no allegations of fact showing that Plaintiffs are the intended third-party beneficiaries of consumer insurance policies, even in the alternative.  (*See* Doc. # 39.)  To the contrary, it expressly denies that Plaintiffs' claims "are brought on behalf of any policyholder" under an insurance policy, and asserts that Defendants had an "independent legal duty . . . **based upon the Equal Pay Statute** and **this is the basis for the [Plaintiffs'] claims**."  (*Id,* ¶¶ 39, 40) (emphasis added).

you know, a number of other things that only a of lawyer would know, the person normally closing the situation would not know. I'm only concerned that – I can agree that if you both are just putting glasses on someone, I don't think it would be fair to charge different amounts.  But I know I, as a lawyer, charge more for a real estate closing than a real estate broker, not because of what I physically sit there and do that particular day.  In putting on glasses or closing a real estate deal, but the years of experience that I bring down to that, so that there's something beyond just the real estate closing, then I'm able to see that.

The following statement was made in response:

I think I can answer that.  What we're talking about is a package which has **a benefit in it which can be performed in total** by either an optometrist or an ophthalmologist.  **What we're saying is that each of the professions should be paid the same.**

(Doc. # 56 at 8–9.)[12]  Plaintiffs contend that this statement made by an unidentified person, about how "each of the professions should be paid the same," is an indication that "**the legislature openly discussed and was fully aware** that House Bill 1107 would require carriers to reimburse healthcare providers, regardless of their license and/or experience, the same amount when they are performing substantially identical services."  (*Id.* at 9) (emphasis added).  The Court is not persuaded.  First, far from showing that the entire Colorado legislature "openly discussed and was fully aware" that Section 10-16-104(7) would apply to health care providers, this individual's statement is ambiguous, as he or she specifically discusses "a package which has a benefit in it"; this could be an indication that he or she was, in fact, referring to how consumers' insurance policies should have equal benefits **for policyholders** across professions for similar services.  In any case, when contrasted with the plain language of the statute,

_____

[12] Unfortunately, Plaintiffs provide no citation to this separate House hearing, nor do they provide a transcript of this hearing.

the statutory structure, and the specific legislative history discussed immediately above, the Court does not find this single, ambiguous statement by an unidentified person (who may or may not have been a legislator) to be compelling evidence of legislative intent.

In sum, because Section 10-16-104(7) governs the reimbursement amounts owed to an insured individual under a policy of "sickness and accident insurance," not to payments by Carriers to health care providers, Plaintiffs cannot prevail on their claim for a violation of the Act as a matter of law.[13]

## B.   **Plaintiffs' Breach of Contract Claim**

Plaintiffs allege that the Carriers have breached either their Provider Agreements or their implied-in-fact contracts with Plaintiffs in violating Section 10-16-104(7), by "utilizing Fee Schedules that reimbursed the [Plaintiffs] at rates lower than other

---

[13] Plaintiffs also argue that their interpretation of Section 10-16-104(7) is supported by a May 23, 2013 letter, written by a Policy Analyst at the Colorado Division of Insurance, Department of Regulatory Agencies (DORA Letter). Ordinarily, a court considers only the contents of the complaint when ruling on a Rule 12(b)(6) motion. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Exceptions to this general rule include: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes their authenticity; and "matters of which a court may take judicial notice." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). However, the DORA Letter was not referenced in (nor attached to) Plaintiffs' Complaint. (*See* Doc. # 39.) Nevertheless, Plaintiffs argue that this Court should "take judicial notice" of the DORA Letter in deciding the instant Motion, "because it reflects the statutory interpretation of the governing agency, the Colorado Division of Insurance. In addition, Plaintiffs' [sic] submit the DORA letter in response to Defendants' arguments, including the argument that Colorado's Insurance Commissioner purportedly interpreted the Equal Pay Statute [sic] as designed to reimburse policyholders." (Doc. # 56 at 10, n. 5.) That Plaintiffs submitted the DORA letter in response to Defendants' arguments is utterly irrelevant (indeed, this proposition would justify the use of outside evidentiary material by a plaintiff in response to every single motion to dismiss). Nor is it appropriate for the Court to take "judicial notice" of such a letter. *See* Fed. R. Evid. 201(b) (noting that a court may take judicial notice of a fact "that is not subject to reasonable dispute because it is generally known within the trial court's territorial jurisdiction" or a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.") Nonetheless, the Court examined the DORA Letter, and notes that its language does not support Plaintiffs' claims; rather, the letter is consistent with the notion that Section 10-16-104(7) governs fee schedules and reimbursement rates in individual insurance policies.

healthcare providers when providing substantially identical services."

(Doc. # 39, ¶¶ 59–60).   However, a breach of contract claim necessarily requires a plausible allegation that there was a contract of some ilk between the Carriers and Plaintiffs.   *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (a party attempting to recover on a claim for breach of contract must prove, among other things, "the existence of a contract.")   As the Court has determined that Section 10-16-104(7) does not govern any contract (express or implied) between the Carriers and Plaintiffs, but rather, governs contracts (i.e., insurance policies) between the Carriers and insured consumers, and because Plaintiffs have expressly denied bringing claims under such insurance policies or on behalf of such consumers,[14] Plaintiffs' claims for a breach of contract necessarily fail as a matter of law.   *See Gorab v. Equity Gen. Agents, Inc.*, 661 P.2d 1196, 1198 (Colo. App. 1983) ("Since [defendant] . . . is not a party to the contract of insurance, it is not bound by duties created under the contract.   Accordingly, liability for breach of those duties, whether the breach be contractual or tortious in nature, cannot be visited upon the [defendant].")

**C.**   **Plaintiffs' Colorado Consumer Protection Act Claim**

To state a claim under the Colorado Consumer Protection Act (CCPA), among other things, a plaintiff must show that a defendant "engaged in an unfair or deceptive trade practice."   *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d

---

[14] Plaintiffs' Complaint specifically states, "None of the claims asserted herein are brought on behalf of any policyholder, nor do any of the claims involve a dispute brought by any policyholder under an insurance policy.   The Carriers owe an independent legal duty to the [Plaintiffs] based upon the Equal Pay Statute and this is the basis for the [Plaintiffs'] claims." (Doc. # 39, ¶¶ 39 & 40).

142, 146-47 (Colo. 2003).  In the instant case, Plaintiffs allege that the Carriers engaged

in unfair or deceptive practices in making false or misleading representations and/or

omissions – specifically, (1) "[f]alse representations and/or nondisclosure by each

Carrier regarding the Fee Schedules and out-of network reimbursement rates being

offered and used by other healthcare providers"; (2) "False statements and/or

misleading representations by each Carrier that its Provider Agreements, Fee

Schedules and out-of-network reimbursement rates complied with all applicable laws,

including the Equal Pay Statute [sic]."  They also allege, more generally, that the

Carriers' "systematic failure to comply with the Equal Pay Statute [sic] and reimburse

the Providers at the appropriate rate" was an unfair or deceptive trade practice.  (Doc. #

39, ¶¶ 65 & 66.)  Because Plaintiffs' sole allegations of false statements and

misrepresentations are premised on the Carriers' violations of Section 10-16-104(7),

and because the Court has determined that the Carriers did not, in fact, violate Section

10-16-104(7), the Carriers could not have could not have engaged in "unfair or

deceptive trade practices" in violation of the CCPA.  Indeed, Plaintiffs' Complaint makes

it abundantly clear that "The claims asserted in this lawsuit **all stem from** each Carrier's

failure to comply with the terms of the Equal Pay Statute by reimbursing the Providers at

rates lower than other healthcare providers providing substantially identical services."

(Doc. # 39, ¶ 9) (emphasis added).  Likewise, their Response does not dispute that, to

the extent that the Act does not provide the relief they seek, their CCPA claims are

untenable; they state only that "Contrary to Defendants' argument . . . the Equal Pay

Statute [sic] plainly entitles Plaintiffs to the requested relief." (Doc. # 56 at 26.)

Accordingly, Plaintiffs' CCPA claim also fails as a matter of law.[15]

**D.      Plaintiffs' Claims Under Colo. Rev. Stat. §§ 10-3-1115 and 1116**

Plaintiffs also bring claims under Colo. Rev. Stat. §§ 10-3-1115 and 1116; these

statutes permit a first-party claimant to "recover reasonable attorney fees and court

costs and two times the covered benefit," *id.* § 10-3-1116(1), if an insurer "unreasonably

delay[s] or den[ies] payment of a claim for benefits owed to or on behalf of any first-

party claimant," *id.* § 10-3-1115(1)(a). In their Response to the instant Motion, Plaintiffs

assert that the Carriers violated Colo. Rev. Stat. § 10-3-1115(1)(a) by underpaying

Plaintiffs for their chiropractic work with patients: "The 'claim for benefits owed' are the

amounts Defendants were required to pay Plaintiffs for services Plaintiffs provided to

Defendants' insureds. Plaintiffs' [sic] allege Defendants underpaid Plaintiffs for their

chiropractic services by failing to pay the amount required by the Equal Pay Statute

[sic]." (Doc. # 56 at 27–28) (emphasis added, citing Doc. # 39, ¶ 74.) Even putting

aside the issue of whether Defendants could recover under Colo. Rev. Stat. §

10-3-1116(1) as "first-party claimants," because this alleged violation, like Plaintiffs'

other state law claims, is premised on a violation of Section 10-16-104(7), it, too, must

---

[15] In the alternative, it also bears mention that Plaintiffs must plead deceptive trade practices with particularity under Colo. R. Civ. P. 9(b). Specifically, they must identify, for each Defendant, "what th[e] misstatements were" and the specific "occasions on which" the misstatements were made. *Noland v. Gurley*, 566 F. Supp. 210, 216 (D. Colo. 1983) (internal quotation omitted); *see also State Farm Mut. Auto. Ins. Co. v. Parrish*, 899 P.2d 285, 287 (Colo. App. 1994) (dismissing CCPA claim where plaintiff's claims were stated in "conclusory terms without identifying transactions or even a range of dates . . . ."). Plaintiffs' generalized allegations of "false statements and/or misleading representation by each Carrier" do not come close to meeting this standard (*See* Doc. # 39, ¶¶ 65 & 66), providing another, independent basis for dismissal of Plaintiffs' CCPA claims.

fail.  By definition, there can be no benefit "unreasonably denied or delayed" under Colo. Rev. Stat. § 10-3-1115(1)(a) if there is no benefit owed in the first instance.

**E.**     **Plaintiffs' Unjust Enrichment Claim**

Finally, Plaintiffs bring a claim for unjust enrichment, which is a judicially-created remedy intended to prevent one party from unfairly benefitting to the detriment of another party.  *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo. 2008).  It requires a Plaintiff to show that "(1) at plaintiff's expense, (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying."  *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008). Plaintiffs allege that "[b]y failing to comply with the Equal Pay Statute [sic] and underpaying the Providers for the out-of-network services performed, the Carriers received, at the very least, the benefit of providing their policyholders with a choice of medical providers without having to reimburse the Providers at the same higher rate it reimbursed other health care providers."  (Doc. # 39, ¶ 80.)  They allege that this was unjust because "[t]he Carriers acted wrongfully and improperly in refusing to comply with the Equal Pay Statute and to pay the Providers the same rate as other types of healthcare providers . . . performing substantially identical services."  (Id., ¶ 82.)  Even when read in the light most favorable to Plaintiffs, the Amended Complaint does not contain allegations that would allow Plaintiffs to recover under this claim for two separate reasons, both of which are grounded in the fact that there was no violation of Section 10-16-104(7).

First, the Carriers did not receive a "benefit" – even the rather amorphous benefit "of providing their policyholders with a choice" of less expensive medical providers – because they were never required, by the Act, to pay Plaintiffs more than they did. Thus, Plaintiffs received the full amount they were owed; *ipso facto*, there was no unjust enrichment. *Cf. Berenergy Corp. v. Zab, Inc.*, 94 P.3d 1232, 1238 (Colo. App. 2004) *aff'd*, 136 P.3d 252 (Colo. 2006) ("there is nothing unjust about retaining a benefit conferred gratuitously.")  Second, although the Colorado Supreme Court has acknowledged that "[t]he notion of what is or is not 'unjust' is an inherently malleable and unpredictable standard," *DCB Const. Co. v. Central City Development Co.*, 965 P.2d 115, 120 (Colo. 1998), it surely would stretch the definition of what constitutes "unjust" circumstances beyond recognition to suggest that the Carriers, which had no legal duty under Section 10-16-104(7) to pay Plaintiffs any more than they did, acted "unjustly" in merely paying Plaintiffs what they were owed.  *Cf. R.A.S. Builders, Inc. v. Euclid & Commonwealth Assocs.*, 965 P.2d 1242, 1244 (Colo. 1998) (emphasis added) (holding that a landlord could keep the improvements a tenant's contractor made to leased premises because the tenant defaulted on its lease and the contractor never had any reason to expect that the landlord would pay the contractor, and noting that to successfully show that the circumstances were unjust, "the facts must also **demonstrate an injustice such as fraud or coercion**.  At a minimum, there must be some type of improper, misleading, or deceitful conduct").  As such, Plaintiffs' unjust enrichment claim also fails as a matter of law.

## IV. **CONCLUSION**

For the foregoing reasons, it is ORDERED that Defendants' Joint Motion to Dismiss (Doc. # 45) is GRANTED.  The Court has determined that Section 10-16-104(7) regulated reimbursements owed to individual policyholders under their insurance policies, not reimbursements owed to health care providers; however, Plaintiffs themselves acknowledge that "[t]he claims asserted in this lawsuit **all stem** from" the Carriers' purported violations of Section 10-16-104(7).  (Doc. # 39, ¶ 9) (emphasis added).  As such, it is "'patently obvious' that the plaintiff[s] could not prevail on the facts alleged, and allowing [them] an opportunity to amend [their] complaint would be futile."  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (internal quotation omitted).  Accordingly, it is

FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE in its entirety.  It is

FURTHER ORDERED that the Joint Motion to Dismiss (Doc. # 59) and Defendants' Motion to Dismiss Certain Plaintiffs' Complaint, or in the Alternative, Stay Proceedings (Doc. # 44) are hereby DENIED AS MOOT.

DATED:  March 31, 2016

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge